(114 So. 155)

No. 27865.

## VAN ASSELBERG v. VAN ASSELBERG et al.

July 11, 1927. Rehearing Denied Oct. 4, 1927.

*(Syllabus by Editorial Staff.)*

1. Divorce ⬤⟲129(16)—Evidence held not to entitle husband to divorce on ground of adultery.

In suit by wife for separation from bed and board on ground of cruel treatment and defamation of character, evidence did not entitle husband to decree of absolute divorce on ground of adultery.

2. Divorce ⬤⟲130—Evidence held to entitle wife to separation from bed and board on ground of cruel treatment and defamation of character.

In suit by wife for separation from bed and board on ground of cruel treatment and defamation of character, in which husband asked for decree of absolute divorce on ground of adultery, evidence *held* to entitle wife to judgment of separation from bed and board.

3. Divorce ⬤⟲276(4)—Evidence held to show that purported sale by husband before wife instituted divorce suit was attempt to place property beyond wife's reach, and wife was entitled to have sale set aside.

Evidence *held* to show that purported sale to brother by husband shortly before wife instituted action for divorce was result of combination between brothers to place property beyond reach of wife, and yet, for all practical purposes, to retain property and to enjoy it as before in indivision between them, and wife was entitled to have same set aside and property restored to community.

Appeal from Ninth Judicial District Court, Parish of Rapides; Leven L. Hooe, Judge.

Suit by Mrs. Lula Van Asselberg against Edward Van Asselberg and another, in which defendant named filed a cross-action. From a judgment for defendants, plaintiff appeals. Affirmed in part, and reversed and rendered in part, and case remanded.

K. Hundley, of Alexandria, for appellant.

Lamar Polk and J. C. Cappel, both of Alexandria, for appellees.

THOMPSON, J, This is a suit for separation from bed and board on the ground of cruel treatment and defamation of character of such a nature as to render it impossible for the spouses to longer live together in the marital relation.

Coupled with the action for separation is a demand to set aside a sale of all of the real estate of the community made by the husband to his brother a few days before the suit

was filed, on the ground that said sale was without consideration and made in anticipation of plaintiff's suit and in fraud of her community rights.

The husband's brother was joined as a party defendant, and the two answered affirming the validity of the sale and the bona fides of both vendor and purchaser.

The husband denied that he had treated his wife cruelly or that he had defamed her character in public, but admitted that he had accused her privately of acts of infidelity. He specially charged his wife with having committed adultery with a certain named party, and asked for a decree of absolute divorce.

The trial judge rejected the plaintiff's demand, and granted that of defendant.

The issue is mainly one of fact, and, while we are always prone to give weight to the conclusions of the trial judge, we find ourselves unable, after a careful examination of the record, to agree with our learned brother in the instant case.

The two defendants came to this state from Belgium in 1904, and in 1912 Edward and the plaintiff were married. The plaintiff at the time was 16, and her husband was 20 years her senior. He had been married and divorced before coming to this country. The marriage with the plaintiff took place in St. Landry parish, but the couple shortly thereafter moved to Rapides and established their matrimonial domicile near Alexandria.

The bachelor brother made his home with his brother and sister-in-law. The two brothers were farmers, and in the course of time accumulated several pieces of real estate for which they paid something over $22,000. The title to this property was taken in the name of the two brothers, and one-half interest became an asset of the marital community existing between plaintiff and Edward.

It was not long after the marriage before the domestic troubles began, and, as time went on, the quarrels became more frequent and more serious and lasting, and were due no doubt to the disparity in age and the jealousy of the husband.

The final breach came in 1925, when the plaintiff, as she claims, was forced to leave the common dwelling and to seek shelter elsewhere.

The plaintiff testified that every time she would go to town and return her husband would accuse her of being with men; that he would curse and abuse her and beat her, and that this occurred more than fifty times; that he said she was just a bad American woman, like most of them are; that he accused her of committing adultery more than once, and that he made this charge before any one, in the presence of her children and on the streets; that in the latter part of July, 1925, he gave her a whipping, and that she went to her mother's to get her, when he accused her of taking a man along, and that he whipped her again and also struck her mother; that he finally told her, "You dirty woman, you get away; I don't want to live with you any more; you take the street where you belong."

It was admitted on the trial of the case that the plaintiff's mother, who was sick in bed at the time of the trial, if present, would testify that during the month of July, 1925, the defendant, without any provocation, struck his wife, beat and abused her, necessitating the treatment of said bruises by Dr. J. I. Peters; that at the same time the defendant cursed his wife and threatened to take her life; that he told her to get out of the house, that he would not live with her any longer; that he also ordered the said witness (plaintiff's mother) away from the house; that on a previous occasion the plaintiff was given the same treatment by her

husband; that he accused his wife of adultery on numerous occasions.

Dr. Peters testified that the plaintiff came to his office during the summer of 1925 in company with her mother; that he made an examination and found bloodshot spots over her body; that they were on her extremities, one on her arm· and leg; that she showed him several bruises, and referred to others that she did not show him; that there were clear signs of being bruised, but none of the bruises were of a very serious nature.

Mrs. Praet, a neighbor of plaintiff for some 10 years, testified that she never saw the husband strike his wife, but she frequently heard him abuse and curse her, calling her all sorts of names, and accusing her of going with other men.

Of course the defendant denies cursing and beating his wife, but, as before stated, he admitted accusing his wife of illicit intimacy with other men. Aside from defendant's testimony, there is no evidence to contradict the positive testimony of the plaintiff, her mother, Mrs. Praet, and Dr. Peters.

If the testimony of these witnesses be true, and we do not see how the court can reject it, then clearly the plaintiff is entitled to a judgment in her favor.

The only theory on which judgment could have been rendered against the plaintiff is that the charge of adultery was proven, and that fact entitled defendant to an absolute divorce as against plaintiff's demand for separation from bed and board.

The charge of adultery has for its basis the testimony of a young man named Beaseley.

He places the scene on the public highway near Alexandria in the late afternoon of June 15, 1925. He says he was traveling along the road in his car at a speed of 5 or 6 miles an hour; that he saw a car parked on the side of the road and off from the road some 25 or 30 yards he saw the plaintiff and one Foreman in the act of adultery. He says he recognized both plaintiff and Foreman; that Foreman wore a dark suit and had on a black hat. He was not well acquainted with Foreman. He told plaintiff's counsel that he had never seen Foreman before the occasion mentioned on the road, and had not seen him since that day until he recognized him in the courtroom.

When the counsel for defendant took him over for re-examination, he said he and his wife had seen Foreman on previous occasions in a car with the plaintiff.

The witness Beaseley also stated that his wife was in the car with him when he passed the plaintiff and Foreman on the roadside, but later he said he was alone in his car.

He also stated that the plaintiff's husband asked him about seeing his wife and Foreman on the roadside, and that he told him what he saw. The husband, however, denied that Beaseley had told him anything about the event related, and said that he got his information from Beaseley's father.

The incident as stated is laid along the public roadside in broad daylight, where any one passing that way could scarcely have avoided seeing the parties, especially on having their attention attracted by the empty car parked on the side of the road.

The testimony of this witness stands alone and uncorroborated, and is so intrinsically improbable and unreasonable that the court must hesitate before acting on it. To accept the testimony of the witness named would stigmatize and forever blacken the character of the young wife and mother of two children, whose prior life and conduct had been above reproach except for a few instances where she was guilty of youthful imprudence and indiscretion.

The plaintiff and her alleged paramour both deny the act of adultery imputed to them. They deny that they were even out driving on the highway named. The man

Foreman says that he was at work at Le Compte during the month of June, and that he wore a light-colored suit and a straw hat. He did not have a dark suit nor a black hat as stated by Beaseley.

There is some testimony to the effect that the plaintiff and Foreman were seen driving in plaintiff's roadster on two or three occasions, but the only witnesses to testify to such incidents outside of Peterman were the relatives of the husband.

The plaintiff and Foreman both deny that they had been in the plaintiff's car together.

It is not improbable that these witnesses got Foreman confused with a carpenter, Smith, who had worked for plaintiff's husband, and who had been with plaintiff in her car on several occasions and had taught her how to operate it. There was no suspicion of wrongdoing between plaintiff and Smith.

The kissing incident related by the young 11 year old daughter is unbelievable. She was under the constant care and control of her father after the separation, and had not made known the fact that Foreman had kissed her mother until after the separation.

We said, in the recent case of Mauberret v. Mauberret, 158 La. 899, 105 So. 6, that:

"This court will not place the stigma of unchastity upon a wife, the mother of innocent children, in any case, upon bare suspicion of guilt, but will require clear and convincing proof in all cases of this character. Some women who are not really guilty of wrongdoing, act imprudently at times, and subject themselves unnecessarily to criticism and censure."

As we said before, the plaintiff may have been indiscreet. She was no doubt talked about by some of her neighbors, but most of the "talk of the town," when run down, was traced to the defendant's relatives, and had its origin with the husband himself.

It is significant that, while it is claimed that the plaintiff was much talked about, the only wrongdoing that was sought to be established against her, other than the incident testified to by Beaseley, was the fact that she was seen twice in her own roadster in company with Foreman, and on one of these occasions testified to by the plaintiff's daughter she was only with Foreman 15 minutes.

[1] The charge of adultery, in our opinion, is not established, at least with that degree of certainty absolutely required before the court would be justified in granting a divorce.

[2] Having reached this conclusion and believing that the plaintiff is entitled to a judgment of separation from bed and board, the only remaining question to be considered is the attack made upon the sale of all of the community real estate by the husband to his brother.

The sale was made less than a month prior to the filing of this suit, and after the separation.

It was known at the time that a suit to dissolve the marriage would be filed, and, from all of the circumstances, we are convinced that the sale was made in anticipation of the suit, and in order to defeat the claims of the plaintiff to her half interest in the property.

The property had been paid for principally if not altogether out of the earnings of the two brothers after they came to this country. They lived and worked together. Their earnings went into a common fund.

They kept no accounts with each other. When bills were to be paid, they were paid out of the common earnings. In fine, what belonged to one also belonged to the other.

After the sale, matters continued as before. There was no change. The husband and his children continued to live in the same common dwelling. The bachelor brother continued to abide at the same place as before the sale. The husband exercised the same joint control and authority over the property as he had done before the sale.

The consideration stated in the act of sale was $7,000 cash. On the trial of the case,

there was an effort to show that the price was made up of two items, a check for $4,200 drawn by the purchaser on a bank in the city of Alexandria, and $2,800, which is claimed the defendant husband owed his brother for money advanced or loaned to him some 15 years before.

Neither of the brothers kept a regular account in the bank. When they did have an account, the deposits were small, never exceeding a few hundred dollars.

On the very day the check was given, a sum sufficient to meet it was deposited by the drawer. The check was presented and paid on the same day it was drawn. There is no explanation made by either of the brothers of this unusual transaction.

No reason is suggested why the money to make the cash payment should have been deposited in the bank and drawn against instead of being turned over to the seller in presence of the notary who passed the act.

It would require more evidence than is to be found in the record to convince the court that the purchaser had this amount of money of his own on his person or about his premises, or that it was intended to represent an actual and permanent partial payment of the purchase of the property.

The evidence as to the indebtedness claimed to be due by Edward to August, and which constituted a part of the alleged price of the sale, is no more convincing.

As stated by each of the brothers, they had kept no account of any money transactions had between themselves or with third persons. They used the common fund as they saw fit and to serve their individual purpose.

There was never any division of funds, and there was never a time when either could be said to have had personal funds to loan to the other. When Edward decided to sell out, and brother August concluded to buy, they just put their minds together and agreed that brother Edward owed brother August $2,800, the principal part of which was money loaned to Edward by August to make two trips back to their native country about 1910 to settle up their father's estate and to get what was coming to them.

Edward, when asked how they arrived at the amount he owed his brother, stated that whenever he needed money he went to him; that he never kept any record of it, and did not know what he owed his brother from the small business; that they just agreed that it was $2,800. He further testified that the reason he made the sale, that he was broke and disgusted at the way his wife had treated him.

August testified that he loaned his brother money at different times, but that he kept no account of it, that he and his brother agreed that the amount was $2,800, and that they would call it square at that figure. He gave as a reason for buying the property that he knew that the woman (his brother's wife) was never going to take care of the children, and every cent that she could get she would spend it on herself and with company and throw it in the air; that he knew that, and saw it going, and that was the reason that he bought his brother's interest, was for the sake of the children and not for his part.

He further testified that he sent his brother Edward back to Belgium to settle up the affairs there; that his brother brought something over $5,000 belonging to them, and they invested it in real estate.

But he does not explain why his brother Edward should be charged up with the entire expense of the trips and himself share no part of such expense.

[3] To sum up the whole of the testimony of the two brothers, the conclusion is inescapable that the purported sale was the result of a combination between the two brothers to place the property beyond the reach of the plaintiff and yet for all practical purposes to retain the said property and to enjoy

it as before, in indivision between them. Such a transaction cannot receive the sanction of this court.

We may here appropriately repeat what was said in Harrington v. John, 161 La. 974, 109 So. 781:

"Nami John was unable to submit any evidence establishing the expenditures he claimed to have made for account of his brother. He testified in a general way that he 'just figured up' what Thomas John owed him for taking care of him during his childhood, bringing him to this country, and helping after he arrived here."

"It is unbelievable that, if Thomas John owed Nami John the considerable sum they now claim is due, the latter should have made no attempt to collect it during the seven years Thomas John was in his employ."

As in that case, so it is in the instant case, the brothers were unable to furnish any evidence of the debt. They just brought their minds together and agreed on the amount. Their testimony is unbelievable.

The trial judge, while rejecting the plaintiff's demand for separation, allowed her alimony pendente lite; that is to say, from August 22, 1925, till the date of the judgment. We see no sufficient reason for changing the amount allowed.

For the reasons assigned, the judgment, in so far as it allows alimony in favor of the plaintiff, is affirmed.

In all other respects the said judgment is reversed, and it is now ordered that there be judgment in favor of the plaintiff and against her husband, decreeing a separation from bed and board and a dissolution of the community of acquêts and gains.

It is further ordered that the sale of the community property made by the husband to his brother be declared a simulation, that the same be set aside, and the said property restored to the community.

It is further ordered that the plaintiff have the permanent care and custody of the two minor children, issue of the marriage between plaintiff and the said Edward Van Asselberg.

It is further ordered that this case be remanded to the district court for the liquidation and settlement of the marital community, and that the defendants pay all costs.